# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

NADINE M. GINWRIGHT,

    Plaintiff,     :     Case No. 3:08-cv-298

    -vs-     Magistrate Judge Michael R. Merz

:

DAYTON BOARD OF EDUCATION, et al.,

    Defendants.

## DECISION AND ORDER

This case is before the Court on Defendants' Motion for Summary Judgment (Doc. No. 36), Plaintiff's Memorandum Contra (Doc. No. 41), and Defendants' Reply (Doc. No. 42). The Court heard oral argument on the Motion on April 27, 2010.

The parties have unanimously consented to plenary magistrate judge jurisdiction under 28 U.S.C. § 636(c) and the case has been referred on that basis (Doc. No. 12). The Magistrate Judge is thus authorized to decide this dispositive motion.

Plaintiff originally brought this action *pro se* and the Complaint was of her own drafting (Doc. Nos. 1, 3). Sometime after counsel appeared on her behalf, counsel filed an Amended Complaint (Doc. No. 15) which was stricken because it was filed without consent or court permission (Notation Order, 12/29/2008). Eventually, the Court granted leave to amend after Defendants consented (Notation Order, 1/13/2009). The operative pleading, therefore, is the Amended Complaint attached as Exhibit 2 to Plaintiff's Motion for Leave to File Amended Complaint (Doc. No. 19). For ease of reference, the Amended Complaint has now been separately docketed (Doc. No. 43)[1].

---

[1] As indicated by Defendants (Doc. No. 36 at 1, n.1), Plaintiff should have herself filed the Amended Complaint after leave to file it was granted. It is not the responsibility of the Clerk to detach a proposed amended complaint from the motion seeking leave to file. Nonetheless, parties often fail to take this procedural step. Because no prejudice is caused to Defendants, the Court treats the Amended Complaint as the operative pleading from January 13, 2009.

The Amended Complaint does not name John P. Concannon as a defendant, although he was named in the *pro se* Complaint and service was perfected on him (See Doc. Nos. 3, 10). The Court reads the Amended Complaint as abandoning any claims against Mr. Concannon, a reading confirmed at oral argument, and any such claims are ordered dismissed with prejudice. Plaintiff's counsel also conceded at the oral argument that Plaintiff no longer seeks punitive damages for her claims and all punitive damages claims made in the Amended Complaint are ordered dismissed with prejudice.

The Amended Complaint purports to state claims arising under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, et seq., and the parallel provisions of Ohio law, Ohio Rev. Code § 4112.99 (Amended Complaint, Doc. No. 43, at ¶ 1.) The Court has subject matter jurisdiction over the federal claims under 42 U.S.C. § 2000e-5, 28 U.S.C. § 1343, and 28 U.S.C. § 1331, and over the state law claims under 28 U.S.C. § 1367; jurisdiction is not contested.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.* The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F. 3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F. 2d 606, (6th Cir. 1992).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

The facts set forth in this Decision are admitted or established by evidence competent under Fed. R. Civ. P. 56(e) and not controverted by opposing competent evidence.

**Undisputed Facts**

Plaintiff Nadine Ginwright was employed by Defendant the Board of Education of the Dayton City School District ("Dayton Public Schools") from 1990 until she resigned in August, 2006, with an effective date of September, 2006. She taught at Fairview Middle School from 1998 until her resignation. Defendant Edward Sweetnich, Director of Human Resources for Dayton Public Schools, urged Ms. Ginwright not to resign, but instead to take a medical leave of absence.

Immediately after her resignation, indeed before it became effective, she filed a handicap discrimination charge with the Ohio Civil Rights Commission ("OCRC"). That Charge was mediated by the OCRC, resulting in a Conciliation Agreement of October 19, 2006. The major operative terms of the Agreement are that Ms. Ginwright would release her claims against Dayton Public Schools and she would be considered for reappointment as a teacher for the 2007-2008 school year.

After resigning, Ms. Ginwright had knee replacement surgery, one knee in the fall of 2006 and the other in the spring of 2007. In June, 2007, Ms. Ginwright wrote to Defendant Edward Sweetnich, seeking an appointment as a teacher for the 2007-2008 school year, but was not re-hired. She filed a new charge with the OCRC and eventually received a right to sue letter from EEOC in May, 2008.

**Analysis**

1.  **Impact of the Conciliation Agreement:**

    Noting that Ms. Ginwright has filed only a discrimination claim[2], Defendants assert she is

---

[2] The Amended Complaint only contains one count for disability discrimination (Doc. No. 43 at 5) although Plaintiff is brining suit under both the ADA and Ohio Rev. Code § 4112.99. The Amended Complaint does allege that Defendants refused to consider her for reemployment in 2007 and that such refusal "breaches the Conciliation Agreement." *Id.* at ¶ 47.

barred from doing so by the Conciliation Agreement ("Agreement"; copy attached to Ginwright Deposition as Exhibit N, PageID[3] 291-292) and that her sole remedy is suit for breach of the Agreement. (Motion, Doc. No. 36, at 7-8).

The Agreement provides that it is a final order of the Ohio Civil Rights Commission (Agreement, ¶ 3.) It does not constitute an admission of any violation of Ohio Rev. Code Ch. 4112 by Dayton Public Schools. *Id.* at ¶ 4. In it, Ms. Ginwright "waives, releases, and agrees not to sue Respondent [Dayton Public Schools] for any claims arising under Ohio Rev. Code Ch. 4112 that were the subject of the above-referenced charge [Charge Number (ADR/DAY) B6 (17923) 08312006]. *Id.* at ¶ 6. While Ms. Ginwright released her claims, the OCRC reserved the right to initiate further proceedings, including a suit in common Pleas Court, to enforce the Agreement. *Id.* at ¶ 8. Finally, Respondent promised that it "will consider Charging Party for a full-time teaching position for the 2007-2008 school year upon receipt of Charging Party's application and will seek an assignment that will accommodate any medical restrictions she might have." *Id.* at ¶ 9.A.

Defendants argue, and Plaintiff does not dispute, that this Court has subject matter jurisdiction to enforce the Agreement, relying on *Mulbah v. Ypsilanti Bd. of Educ,* 2006 WL 3240681 (E.D. Mich. 2006). In granting the defendants summary judgment in that case, Magistrate Judge Scheer wrote:

> Our Circuit has recognized that employers and employees may negotiate valid releases of Title VII claims. *Runyan v. National Cash Register Corp.*, 787 F.2d 1039 (6th Cir.), cert. denied, 479 U.S. 850 (1986). In determining whether a claimant has waived his right to continue with a discrimination claim, courts apply ordinary contract principles. *Adams v. Phillip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir.1996). A court is bound to give the language used in a release its plain, ordinary meaning. *Grant Co. Save and Loan Ass'n v. Resolution Trust Corp.*, 967 F.2d 722 (4th Cir.1992). When the

---

[3] Effective with the installation of version 4.1.1 of the software, the Court's CM/ECF system automatically affixes a distinctive page number (shown in the upper right-hand corner as PageID) to each page of each filed document. The PageID numbering is retroactive and applies to all CM/ECF filed documents which are printed after the software upgrade. Some of the copies being used by the Court in writing this Decision were, however, printed before the upgrade and the pagination references are to pages as numbered by the filer.

parties have negotiated a release, and both parties agreed to the language included in it, the court will assume the parties are fully aware of the terms and scope of their agreement. *Id.* In the case at bar, the settlement agreement was negotiated following an EEOC/MDCR Complaint and investigation. The language of the agreement is straightforward, and Plaintiff is an educated and articulate individual. The terms of the agreement were approved by the Michigan Department of Civil Rights, as evidenced by the signature of its representative. A valid settlement agreement reached in the course of EEOC administrative proceedings concludes the issues addressed and forecloses a subsequent lawsuit on the same issues.

The gravamen of the common allegations in paragraphs 50 through 62 of the Amended Complaint is that Defendant breached the settlement agreement by subsequent retaliatory conduct, although no discrete breach of contract claim is asserted. In the absence of a finding of a breach by Defendant, the settlement agreement is dispositive of the discrimination claims addressed in it (i.e., all claims prior to the date of the settlement).

> In enforcing these agreements, federal courts give EEOC settlement agreements the same effect as voluntary settlements of general litigation, *Lyles v. Meritor Savings Bank,* 1992 WL 165840*1-2, 1992 U.S. Dist. Lexis 8247, 3-4 (E.D. PA June 11, 1992) (citing *Spiridigliozzi v. Bethlehem Mines Corp., Cambria Division*, 558 F.Supp. 734, 736 (W.D. PA 1980)), because [t]here is no favored status for EEOC complainants entitling them to unusual liberality in disregarding settlements ... what would amount to waiver, release, or covenant not to sue in any civil litigation is sufficient to produce the same consequences with respect to matters covered by EEOC [settlement agreements].

*Melendez v. Horizon Cellular Telephone Co.,* 841 F.Supp. 687 (E.D. PA 1994) (citing *Spiridigliozzi*, 558 F.Supp. at 736).

As the Court in *Melendez* observed, many courts have held that parties who enter into Title VII settlement agreements waive their right to proceed on the underlying claim, in the absence of a showing that the agreement was procured by fraud. *Melendez*, 841 F.Supp. at 691. The opinion opts, however, for a "better approach" suggested in *Spiridigliozzi*. The court in that case determined that, when the release of a Title VII claim is contingent upon the other party's

> performance of the promises made in an agreement (as opposed to being contingent upon the mere promise to perform), the prior claim may be revived only if the alleged non-compliance relates to a matter sufficiently substantial to justify invalidation of the settlement agreement. *Id.* (Citing *Spiridigliozzi,* 558 F.Supp. at 736 n. 1).
>
> The enforcement of Title VII settlement agreements is plainly within this court's subject matter jurisdiction. *EEOC v. Safeway Stores, Inc.,* 714 F.2d 567, 571-73 (5th Cir.1983), *cert. denied*, 467 U.S. 1204 (1984)[4].

*Mulbah v. Ypsilanti Bd. of Educ.,* 2006 WL 3240681, 7 -8 (E.D.Mich.,2006). Although the Agreement on its face is not made under Title VII, it plainly arises out of the same controversy as Ms. Ginwright's Title VII claim on which she received a right to sue letter and therefore would at least come within this Court's subject matter jurisdiction under 28 U.S.C. § 1367.

Assuming this Court has jurisdiction of such a breach of contract claim, Defendants assert that it is Plaintiff's sole remedy, relying on *Parsons v. Yellow Freight Systems, Inc.*, 741 F.2d 871 (6th Cir. 1984). In that case, plaintiff filed a breach of contract action to enforce a settlement agreement reached after the filing of an EEOC charge. However, the Sixth Circuit affirmed dismissal because plaintiff had not first proceeded administratively and obtained a right to sue letter. *Parsons*, in other words, supports what Ms. Ginwright did here: file an administrative charge of breach of the settlement agreement and pursue it until exhausted by issuance of a right to sue letter. *McAlpin v. Lexington 76 Auto Truck Stop, Inc.*, 229 F.3d 491 (6th Cir. 2005), also relied on by Defendants, does not address enforcement of a settlement agreement by a charging party in a discrimination case, but rather the jurisdiction of a federal district court to enforce a settlement agreement, post-judgment, without incorporating the settlement agreement in its judgment. See *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375 (1994).

Dayton Public Schools next asserts it fulfilled its obligations under the Conciliation

---

[4] The Fifth Circuit in EEOC v. Safeway noted that "no federal court has refused jurisdiction over actions to enforce or interpret Title VII conciliation agreements." 714 F.2d at 571.

Agreement (Motion, Doc. No. 36, at 8).

Defendants are correct that they were under no obligation to actually rehire Ms. Ginwright; her understanding to the contrary at the time she filed her second OCRC charge is contradicted by the plain language of the Agreement.

Defendants claim they did consider her after she wrote in June, 2007, that she was ready to return to work. Defendant Sweetnich, undoubtedly the person authorized to give the consideration on behalf of Dayton Public Schools, swears in his deposition that he did so. At oral argument, counsel for Defendants argued there was no evidence to the contrary. However, on June 24, 2007, Mr. Sweetnich wrote to Plaintiff in response to her request for reemployment:

> Thank you for your recent letter regarding reemployment as a Teacher.
>
> At this time, the district is in the midst of a major reduction in force. I have approximately 100 displaced teachers and 200 laid off teachers who would have first rights to employment before you.
>
> I will not be able to consider you for reemployment at this time for these reasons.

(Exhibit 12 to Sweetnich Depo., Doc. No. 40, PageID 443). The letter is admissible as the admission of a party opponent under Fed. R. Evid. 801(d)(2) since it was made within the scope of Mr. Sweetnich's authority as Executive Director of Human Services for Dayton Public Schools.

Defendants argue "Edward Sweetnich's choice of words in the June 24, 2007 letter does not preclude the Court from finding that DPS considered rehiring the Plaintiff. . ." (Motion, Doc. No. 36, at 9.) The Court disagrees. While a jury may conclude that the process Mr. Sweetnich used complied with the Agreement, Mr. Sweetnich's choice of words prevents the Court from concluding that no reasonable juror could find to the contrary. On the question of whether Dayton Public Schools complied with the Agreement, there is a genuine issue of fact.

Moreover, that fact is material. As noted above, the substance of the Conciliation Agreement

9

was that Ms. Ginwright released her prior discrimination claims and agreed not to bring suit on them and in return the Dayton Public Schools agreed to consider her for rehire the next year[5]. Applying ordinary contract principles, as suggested in *Mulbah* and *Spiridigliozzi*, *supra*, Dayton Public Schools' failure to perform the one term it was required to perform would excuse Ms. Ginwright from her release and permit her to litigate the underlying handicap discrimination claim.

Defendants assert that Dayton Public Schools could not have rehired Ms. Ginwright in any event because her teaching certificate expired at the end of June, 2007. Her response makes it clear there is at least an issue of fact on this question, to wit, whether she could have followed the not unusual process and had her certificate renewed before the school year began.

At oral argument, Ms. Ginwright's counsel made it clear that if a breach of the Conciliation Agreement were found, her chosen remedy would be to set the Agreement aside, relieving her from the release which is part of that Agreement and permitting her to proceed on her underlying handicap discrimination claim. That is presumably because it is very likely that, no matter how thoroughly she had been considered for re-employment in 2007 as a new teacher, she would not have been hired because, without doubt, Dayton Public Schools was engaged in a massive reduction in force and presumably many of the laid-off teachers who retained their union seniority rights would have come before her[6]. Because that is her preferred contractual remedy, the Court proceeds with its analysis of the underlying discrimination claim as if Ms. Ginwright had been relieved of the release.

---

[5] Those mutual promises are adequate consideration to support the formation of a contract. The Court rejects Plaintiff's tangential assertion in the Memorandum Contra that there was no consideration given for her release.

[6] Evidence on this point is thin. Ms. Ginwright refers several times in her deposition to her own position as DEA representative at the Fairview building and Mr. Sweetnich, in the June 24, 2007, letter refers to displaced and laid-off teachers. While the evidence is thin, there was no dispute at oral argument that Ms. Ginwright had given up her seniority rights by resigning.

## 2. The Handicap Discrimination Claim - Exhaustion

Defendants contend that, even if her release in the Conciliation Agreement does not bar Ms. Ginwright's underlying discrimination claim, it is barred by her failure to exhaust administrative remedies on that claim (Motion, Doc. No. 36, at 10-11.) The Court disagrees.

It is correct that exhaustion of remedies is required on an ADA claim. *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000), citing 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1); and *Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 853 (6th Cir. 2000). It is also correct that the OCRC and EEOC did not investigate the underlying discrimination claim because the Conciliation Agreement was entered into. Finally, it is correct that an ADA suit is limited in scope to the charge submitted to EEOC and any matters "reasonably expected to grow out of the charge of discrimination." *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828 (6th Cir. 1999).

Ms. Ginwright's second OCRC charge reads "DPS (Respondent) refuse [sic] to honor the settlement agreement made on October 19, 2006, that I would be hired back as a new teacher for the 2007-2008 school year." (Exhibit Q to Ginwright Depo., Doc. No. 39, PageID 295) In very summary fashion, the OCRC determined that there was no probable cause to believe that the failure to rehire was the result of retaliation or disability discrimination. (Letter of Determination, Exhibit S to Ginwright Depo., Doc. No. 40, PageID 297.) But it was certainly reasonable to expect that the OCRC would investigate a claim arising out of an alleged breach of its own negotiated Conciliation Agreement and there is certainly no unfairness to Dayton Public Schools in reading the second charge that way – the Defendants would certainly have known that their conduct in considering Ms. Ginwright for rehire would be at least potentially at issue.

### 3. The Handicap Discrimination Claim - Merits

Defendants assert that even if the Court reaches Ms. Ginwright's handicap discrimination claim, she cannot prevail because she cannot establish a prima facie case of handicap discrimination (Motion, Doc. No. 36, at 11.)

To establish a claim of discrimination under the Americans with Disabilities Act (the "ADA"), a plaintiff must show "(1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability." *Sullivan v. River City School Dist.,* 197 F.3d 804810 (6th Cir. 1999); *McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369, 371 (6th Cir. 1997), citing *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1179 (6th Cir. 1996). In order to establish a prima facie case of disability discrimination under Ohio law, a plaintiff must demonstrate 1) that she was disabled, 2) that an adverse employment action was taken by her employer, at least in part, because she was disabled, and 3) that she, though disabled, can safely and substantially perform the essential functions of the job in question. *Willis v. Hartzell Propeller Inc.*, 497 F. Supp. 2d 913, 920 (S.D. Ohio 2004), citing H*ood v. Diamond Products, Inc.*, 74 Ohio St.3d 298, 302, 1996 Ohio 259, 658 N.E.2d 738, 741 (1996), and *Hazlett v. Martin Chevrolet, Inc.,* 25 Ohio St.3d 279, 281, 25 Ohio B. 331, 496 N.E.2d 478, 480 (1986). ADA and Ohio handicap discrimination claims are analyzed in the same manner. *Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.,* 209 F.3d 931, 934 n.2 (6th Cir. 2000) (holding that "both federal and Ohio disability discrimination actions require the same analysis"); *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 1998 Ohio 410, 697 N.E.2d 204, 206-07 (1998). The parties have not argued otherwise.

There is no question that Ms. Ginwright is completely qualified to do her job. There is no

evidence that her disability interferes with her ability actually to instruct students, as opposed to getting to her classroom and perhaps as to performing some ancillary duties.

### 1. Does Plaintiff have a disability?

Defendants argue that Plaintiff cannot establish she has a qualifying disability. The ADA defines "disability":

> The term "disability" means, with respect to an individual —
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. §12102(2). Ms. Ginwright claims that she had, during the 2005-2006 school year, a physical impairment that substantially limited her ability to walk. Defendants argue that "moderate difficulty or pain experienced while walking does not rise to the level of a disability." (Motion, Doc. No. 36, at 13, citing *Penny v. United Parcel Service*, 128 F.3d 408 (6th Cir. 1997). In that case the court noted that regulations adopted by the EEOC define "substantially limits" as follows:

> (I) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Id.* at 414, quoting 29 C.F.R. § 1630.2(j)(1) (1996). In deciding whether an individual is substantially limited in a major life activity, courts should consider the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or expected permanent or long term impact, of the impairment. *Id.* citing 29 C.F.R. § 1630.2(j)(2). In *Penny*, the Sixth Circuit agreed with Judge Beckwith of this Court that

> Although the record clearly indicates that Penny suffers an impairment that affects to some degree his ability to walk, he has not

> "adduced sufficient evidence from which a factfinder reasonably could conclude that the nature and severity of his injury significantly restricted his ability to walk as compared with an average person in the general population."

*Id.* at 415, citing *Kelly v. Drexel University*, 94 F.3d 102, 105 (3rd Cir. 1996). The Circuit court then proceeded to consider in some detail both Mr. Penny's evidence and the evidence of disability in other ADA walking cases. The court did not discuss how much evidence would be required to defeat a summary judgment motion on this issue.

Ms. Ginwright testified she began to use a walker sometime in 2005[7] and that Dr. Henderson prescribed the use of a walker in 2006. She also used a four-footed cane and sometimes a wheelchair during that school year. Her illness had progressed to the point that, in November, 2006, and March, 2007, she had both knees replaced. She also testified she had been found disabled and awarded Social Security Disability benefits in 2006 because of her knees. (Ginwright Depo., Doc. No. 39, at 103.) A finding by the Social Security Administration that one is entitled to such benefits requires medical evidence that a person suffers from an impairment or combination of impairments which prevents one from engaging in any substantial gainful employment. (Contrast Mr. Penny who remained employed full time throughout the period for which he made a claim and also went rabbit, squirrel, pheasant, and deer hunting. 128 F.3d at 415.) The Court cannot say on the basis of this evidence that no reasonable jury could find Ms. Ginwright was substantially impaired in her ability to walk during the 2005-2006 school year.

---

[7] She borrowed the walker from a fellow teacher who no longer needed it because she had lost both legs to diabetes (Ginwright Depo., Doc. No. 39, at 40.)

## 2. Did Defendants provide a reasonable accommodation?

Defendants assert that even if Plaintiff can establish a disability within the meaning of the ADA, the accommodations they provided her were reasonable.

The burden of proving the necessity of an accommodation is on the plaintiff. *Smith & Lee Associates. Inc., v. City of Taylor*, 102 F.3d 781, 796 (6th Cir. 1996). The burden of showing that a proposed accommodation is reasonable is also on the plaintiff. *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039 (6th Cir. 2001).

Every year that she was assigned to Fairview Middle School, Ms. Ginwright requested a transfer to another school; these requests were all for professional reasons prior to the 2005-2006 school year. Ms. Ginwright's preferred reassignment was Stiver's School for the Arts. Assuming that this is one of the accommodations that carried over from prior years into her request in 2005-2006, it plainly would not have been a reasonable accommodation for a person with a substantial limitation in her ability to walk, including the ability to climb stairs: it is uncontested that Stiver's is a four-story building with no elevators.

After Ms. Ginwright made her accommodation request in either 2004-2005 or 2005-2006, a meeting was held among her, principal Vondia Jackson, vice-principal James Fowler, and Mr. Sweetnich (Ginwright Depo., Doc. No. 39, at 147). As a result of that meeting, Dayton Public Schools made the following accommodations to Ms. Ginwright's disability:

1. She was given a key to the door from the parking lot nearest to where she parked.
2. A handicapped parking spot (for which she had the required placard) was provided for her near that door and repainted to make the handicap markings plainer.
3. Dayton Public Schools relieved her of monitoring duties and attempted to isolate her duties to one location (Sweetnich Depo. Doc. No. 40, at 31-32.)

In contrast, Plaintiff's request was for assignment to a different classroom. In her deposition she identified rooms which she says would have better accommodated her difficulty in walking, to wit, Rooms 101, 122, 124, 125, and 126 (Ginwright Depo., Doc. No. 39, at 159). She testified Principal Jackson, with whom she had difficulties throughout her tenure at Fairview, refused to move her to a different classroom from Room 108 where she was assigned because, as Jackson said, "all the teachers are set up now and that she was not going to change another teacher." *Id.* at 148.

Instead, Vice-Principal Fowler came up with the idea of the key. Ms. Ginwright believes the key was not a reasonable accommodation because of the slope from the parking lot to that door. However, she had used that door herself before being given a key to it and got in by knocking for the attention of another teacher. *Id.* at 149, 153.

Plaintiff's testimony about how any other room would have been a better accommodation is confusing to the Court. One concern she had was, because of where Room 108 was located, she had to send one of her students to the office to pick up her paycheck twice a month. *Id.* at 157. The Court fails to understand why that is a concern. There is no testimony that the privacy of her paycheck information was compromised that way, so it seems an accommodation to her disability to allow a student to get the check. She testified she wanted a room "[c]lose to all the things I had to do. Close to the auditorium, close to the lunchroom, close to the ladies room." *Id.* at 157-158. However, she admitted that from any of the rooms she requested, she would still have had to negotiate four steps to the auditorium, the same as in Room 108. *Id.* at 158. Room 101 would have been closer to the lunchroom. *Id.* at 160. Room 126 would have been closer to the auditorium where she had to go two or three times a month. *Id.* at 160. Room 101 would have had steps both to the office and to the restroom. *Id.* at 161. She admitted that "Anywhere you go in the school, there was steps. Any direction there was steps." *Id.* at 161. Her preference for Room 101 was that she wouldn't have needed a walker to get from the parking lot to her classroom, but she still would

have needed the walker to get around. *Id.* at 162-163. All of the rooms she wanted were assigned to other teachers at the time of the conference. *Id.* at 164. There is no evidence offered on the need for a room change (or any other accommodation) besides Plaintiff's own testimony.

Defendants rely on *Trepka v. Bd. of Educ. of the Cleveland City Sch. Dist.,* 28 Fed. Appx. 455, 2002 U.S. App. LEXIS 1357 (6th Cir. 2002). In that case, the Sixth Circuit upheld a grant of summary judgment against a teacher making a failure to accommodate claim very similar to Ms. Ginwright's. Ms. Trepka was assigned to Room 104 and requested as an accommodation to be moved to Room 108.

> The only relevant difference between the requested Room 108 and her assigned Room 104 is the distance that Trepka would be required to navigate inside the building from her car. Apparently, Trepka regularly carried teaching materials from her car to her classroom. Her placement in Room 104 increased the distance that those materials would need to be carried.

*Id.* at 460. Ms. Trepka rejected the proposed alternative accommodations of providing her with a cart or assistance carrying materials from her car which the Sixth Circuit found to be adequate. Ms. Ginwright regularly received assistance from others in getting her material into school[8], indicating this accommodation was available to her as well.

The Court concludes that no reasonable jury could fail to find that the accommodations Defendants provided to Plaintiff were reasonable.

---

[8] "And most of the time the guys would take my things for me and then they would, they would do that nearly every day. But see, if I had a room close by my car, I didn't have to even ask nobody [sic] to help me out. They wouldn't [have to] wait around to help me out. Some of them would just wait around to help me out." Ginwright Depo., Doc. No. 39, at 163-164. It is unclear from the context whether the "guys" referred to are fellow employees or male middle school students.

### 3. Was Plaintiff Constructively Discharged?

Plaintiff asserts that the conditions under which she was forced to work, i.e, without her requested room reassignment, amounted to a constructive discharge such that her resignation in August, 2006, was not voluntary.

> To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) "the employer ... deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and 2) the employer did so "with the intention of forcing the employee to quit...." *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir.1999). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982)).

*Logan v. Denny's, Inc.* 259 F.3d 558, 568 -569 (6th Cir. 2001). There is no evidence Defendants did anything between the meeting at which the Plaintiff's request for accommodation was discussed and the time of her resignation letter which made her working situation difficult, other than not giving her the room assignment she requested. Since the Court has already determined that Defendants' proffered alternative accommodations were reasonable, it cannot find that the conditions under which Plaintiff worked were deliberately made intolerable for her. In addition, Mr. Sweetnich's actions to attempt to persuade her not to resign, but to take medical leave instead, negate any finding that her employer wanted to force Ms. Ginwright to resign.

### Conclusion

There is a genuine issue of material fact as to whether Defendants complied with the Conciliation Agreement. Assuming a jury would find that they did not, the Court has proceeded to consider the underlying handicap discrimination claim. The Court found that Ms. Ginwright has

properly exhausted her administrative remedies on that claim and has produced sufficient evidence from which a jury could reasonably conclude that she suffered in the 2005-2006 school year from an impairment which substantially impaired her ability to walk. However, the Court has also concluded that no reasonable jury could fail to find that Defendants offered her a reasonable accommodation or that she was constructively discharged. Since those findings are fatal to her claim, Defendants are entitled to summary judgment.

The Clerk will enter judgment herein, dismissing the Amended Complaint with prejudice.
April 29, 2010.

                                                   s/ **Michael R. Merz**
                                             United States Magistrate Judge